**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (249203)
ak@kazlg.com
Jason A. Ibey, Esq. (284607)
jason@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6806
Facsimile: (800) 520-5523

**HEDIN HALL LLP**
Frank S. Hedin, Esq. (291289)
fhedin@hedinhall.com
David W. Hall, Esq. (274921)
dhall@hedinhall.com
Four Embarcadero Center, Suite 1400
San Francisco, CA 94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

*Counsel for Plaintiffs,*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMANDA HILL; and GAYLE HYDE; individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUICKEN LOAN INC.,<br><br>Defendant. | Case No: 5:19-cv-00163-FMO-SP<br><br>**DECLARATION OF EXPERT ALEXANDER YOUNG** |

I, Alexander Young, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, based on my own personal knowledge, that the following statements are true:

1. I am over 18 years of age, a resident of the State of Illinois, and am fully competent to make this declaration.

2. I have been retained by Kazerouni Law Group, APC to research and report on my findings as to whether it is reasonable to assume that Plaintiff Amanda Hill ("Hill") had sufficient opportunity to view the terms of use ("Terms of Use") link located on the page ("Webpage") with the "See my results!" submit button on the website as disclosed in Defendant's Motion to Compel Arbitration.

3. I was also asked to provide my opinion as to whether I could ascertain whether Hill clicked the "See my results!" button on the Webpage.

## CREDENTIALS AND EXPERIENCE

4. I am the Chief Strategist with ePageCity, Inc. ("ePageCity"). My firm has been exclusively engaged in website design, development and digital marketing services since 1999 and I am one of the co-founders.

5. Under my tenure, ePageCity has launched over 1,000 websites ranging from simple to very complex. A sub-brand agency, Deep Footprint (a DBA of ePageCity) engages in digital marketing services that include user experience testing to validate an appropriate user experience. I hold the title of Chief Strategist to that agency too.

6. Both agencies have been ranked as leaders by the creative industry leader aggregators.

7. At ePageCity, I have been the lead strategist on solving multiple user experience as well as user interface issues. These required a keen understanding of web technology and user interaction.

8. During my time at ePageCity, I have personally authored over 3,000 proposal pages for both website and digital marketing programs and have been personally responsible for the majority of the firm's revenue.

9. I hold a Bachelor's degree with a double major in Computer Science and Business Economics and a minor in Tax from the University of Stellenbosch in South Africa and a post-graduate Computer Science Master's equivalency, obtained cum laude, from the same.

10. My credibility as an expert was tested during a motion to exclude my report and testimony in a case requiring me to review a similar situation; *Karpilovsky v. All Web Leads, Inc.,* No. 17 C 1307, 2018 U.S. Dist. LEXIS 105259, at *11 (N.D.Ill. June 25, 2018). Judge Leinenweber denied Plaintiff's motion to exclude and ruled me and my report credible.

## MATERIALS REVIEWED

11. I was provided case documents concerning this matter that included the Motion to Compel Arbitration (Dkt. No. 29-5) ("Motion to Compel Arbitration"), the Opposition to Defendant Quicken Loan Inc.'s Motion to Compel Arbitration, the Reply in Support of Quicken Loan Inc.'s Motion to Compel Arbitration, supporting declarations thereto and videos referenced by Defendant Quicken Loans Inc., documents from non-party LMB Mortgage Services, Inc. in response to a document subpoena from Plaintiff Gayle Hyde produced December 11, 2019 ("Hill All Customer Inquiry Data"), as well as two declarations produced by Defendant entitled Declaration of Manny Wald and Declaration of Steven M. Rafferty. In addition, I reviewed the two website properties visited by Hill as well as other websites that serve as lead generation sources as these two websites do.

//
//
//
//

## OPPORTUNITY TO VIEW TERMS:
## THE METHODOLOGY – TWO APPROACHES

12. I used two approaches to verify whether it is reasonable to deduce whether Hill would have seen the Terms of Use. The first approach took provided materials and reconstructed the experience based on those materials.

13. The second approach was to travel through the current Webpage to recreate the journey Hill would have taken so as to observe the visibility of the Terms of Use.

### Device Used by Hill

14. Understanding which device is a vital step as different mobile devices have screens of different shapes and some may show more or less content than others.

15. According to Hill All Customer Inquiry Data, Hill visited the Webpage on 10/10/2018. The spreadsheet includes additional information identifying the device used by Hill to access the Webpage. The following pertinent data points are shown:

- (DA) Browser Name         Chrome Mobile
- (DA) Browser Version      69.0.3497.100
- (DA) Diagonal Screen Size 5
- (DA) Display PPI          441
- (DA) Manufacturer         HTC
- (DA) Model                Pixel
- (DA) Year Released        2016
- (DA) OS Name              Android

16. The model, release date and screen specifications very specifically indicate that Hill was using a first-generation Pixel phone using the Chrome browser.

17. A review of changes to the Chrome browser from the version noted until current shows no changes that would impact the visual rendering of elements on the screen.

DECLARATION OF EXPERT ALEXANDER YOUNG                                    PAGE NO. 4

## APPROACHES

**Approach One: Reconstruction**

18. Reconstructing the environment would require knowledge of what the Webpage looked like that Hill was presented with, the browser as well as device she was using to understand how much of the Webpage she was seeing. The browser and device were already known at this point.

19. Paragraph 7 of the Motion to Compel Arbitration states: "Attached as Exhibit 1 to this Declaration are true and correct copies of screenshots reflecting the information entry process that would have been presented to a consumer who navigated to the YourVASurvey.Info website on October 10, 2018…"

20. A copy of the screenshot on page 17 of Exhibit 1, above, is attached hereto as **Exhibit A**.

21. With that ascertained, I would retain the aspect of the screenshot provided by Defendant and overlay that into an electronic copy of the frame of the device, thus displaying what would have been visible and what would not have been in the viewport. The viewport being the visible area of a web page on a device with content that you would need to scroll to considered to be outside the viewport.

*The Reconstruction*

22. Taking the screenshot provided by Defendant and scaling it to show what would be visible to Hill required adjusting the size of the screenshot while maintaining the aspect ratio.

23. The Pixel phone has an aspect ratio of 16:9 (measured either in inches – 2.5 X 4.4 inches, 411 x 731 density independent pixels or resolution at 1080 X 1920) and shows 5 inches diagonally (*see* **Exhibit B**). So, for every 9 horizontal points, there are 16 vertical points of equal size to maintain the correct aspect (so that content isn't stretched or squashed). This means that the screenshot can be shown with the diagonal physical dimension being less or more than 5 inches as long

as the 16:9 aspect ratio is maintained and that the content in the viewport would be presented at the same position, just larger or smaller.

24. As an example, the image on page 4 of the Motion to Compel Arbitration (*see* **Exhibit C**) you can notice that the aspect has not been maintained and the image has been shrunk vertically which gives the illusion that more vertical content is displayed.

25. Three source screenshots exist; Exhibit 1, page 17 from the Defendant's Motion to Compel Arbitration (as **Exhibit A** attached hereto); Exhibit F of Hedin Decl. ISO Response in Opposition to Mtn to Compel Arbitration (Dkt. No. 38) taken 05-09-19 (shown as **Exhibit D** attached hereto); and a screenshot I took using an industry-leading browser emulator, Browserstack, emulating the Pixel phone taken on 12-12-19 of the Webpage (as **Exhibit E** attached hereto).

26. The following differences can be noticed to the visual area – between 10-10-18 and 05-09-19, the "see my results" button was changed from blue to green and text treatment to the heading was changed. These could be in the normal process of A/B testing (the process of testing two very similar marketing pieces to measure which would be considered more effective) but yielded no locational change to any of the elements. None would have impacted the location of the link to the Terms of Use.

27. Sometime after 05-09-19 and before 12-12-19, an additional field was added for Secondary Phone Number. This would have pushed the placement of the Terms of Use further down in **Exhibit E** compared to **Exhibits A and D**.

28. Other than that change, which could be adjusted for in the screenshot, it is my determination that the placement of the Terms of Use on that web page was determinable as any change to the visual layout could be adjusted in measurements.

//
//
//

29. As the Webpage on 12-12-19 was changed to have the Secondary Phone number field, to be more accurate in determining what Hill saw, I took the Defendant's screenshot in **Exhibit A** and scaled it to maintain the 16:9 aspect ratio.

30. I used a screenshot of that image (**Exhibit A**) measuring 322 X 714 pixels and scaled it up to have the same 400 pixel width as the Browserstack image (**Exhibit E**), that would require stretching it to 400 X 886 using the formula 400/322X714 for the height to maintain the 16:9 ratio. That would ensure that the same content Hill would have seen on the Webpage would be visible.

31. This was then placed over the **Exhibit E** Pixel frame resulting in **Exhibit F**.

32. I can conclude that the Terms of Use is not visible on the screenshot I took on the site on 12-12-19 (**Exhibit E**) and the Terms of Use would not be visible on the screenshot as provided by Defendant (**Exhibit F**) on the phone used by Hill during the October 2018 visit.

**Approach Two: The Site Visit**

33. On 01-13-20 I visited the original Webpage URL – yourvasurvey.info and found that the site had changed since my 12-12-19 visit in a manner that the page before the Webpage (**Exhibit G**) asked for an address prior to clicking to the Webpage. The Webpage no longer asked for the address there. Incidentally, the Terms of Use was still not visible (**Exhibit H**).

34. I then visited the website referred to in Hill All Customer Inquiry Data provided by Defendant under their field titled "site" which noted the site as lmb.yourvasurvey.info. I had visited this site on 12-17-19 and had made a copy of the HTML, one of the sources of code used to render the page.

35. For purpose of clarity, as previously noted, Defendant refers to the Webpage as YourVASurvey.Info seven times (e.g. "Hill visited LMB's associated website, YourVASurvey.Info" (Defendant's Motion to Compel Arbitration)). Defendant indicates in its declaration, Hill All Customer Inquiry Data, that the site

visited was lmb.yourvasurvey.info. It was important to verify whether the sites differed sufficiently and to ascertain which of the two were more likely the actual site visited.

36. On my comparative review of what the site looked like on 12-17-19 compared to 01-13-20, there were changes noted. Other than standard cosmetic adjustments and A/B testing as seen in the center versus left alignment of the form labels (First Name, etc.), a blue versus green submit button, small adjustments to the verbiage at the top of the page. This is consistent with A/B testing and code for A/B testing is present in the HTML of the Webpage. (*See* code in **Exhibit I**).

37. Some changes were not typical of A/B testing and are more structural and assumed to be wholesale to all pages being tested. For instance, language for the California Consumer Protection Act (CCPA) added to the footer is a change that would be on any version of the Webpage. Some lender options in the dropdown boxes were also updated. Noticeably, the secondary phone number seen on **Exhibit E** was no longer present. There was scrolling of content that occurred as fields were being entered not seen in the video or observed on the Webpage (at yourvasurvey.info compared to this page at lmb.yourvasurvey.info) as visited on 12-12-19.

38. To verify that nothing else had changed, I decided to complete the form following the steps Hill had taken using the video referenced in the Rafferty Declaration. Therein, Mr. Rafferty notes, in paragraph 4, that:

> A TrustedForm certificate of authenticity includes a video replay of the user's interaction with the page where the script is present. The video replay works by capturing a copy of the webpage and recording all of the user's interactions with the webpage, including any personal information that the consumer inputs, mouse movements, clicks as they happen in real-time, and changes made to the webpage in response to consumer inputs.

//

39. Paragraph 5 continues with, "Enclosed hereto as Exhibit A is a true and correct copy of the video replay."

40. This statement clarifies that Hill's interaction on the Webpage was as shown on that video. It's a true and correct copy.

41. The visual presentation of the live lmb.yourvasurvey.info Webpage compared to the Active prospect video as referenced in the Rafferty Declaration (**Exhibit J**) and the screenshots referenced in **Exhibits A, C** and **D** is the same and therefore Hill's journey could be mimicked on the current website.

42. Completing the form as Hill did (using the same data for the address as Hill did), one can step through what Hill would have seen.

43. The journey on the Webpage would have taken place as follows:

- **Exhibit K** – The Webpage as it first loads – no Terms of Use visible
- **Exhibit L** – The Webpage after the phone number is typed - no Terms of Use visible (note the keypad has popped up in the lower section of the screen)
- **Exhibit M** – The Webpage once the address has been typed as visible in the Active Prospect video at 2 min's and 5 seconds. At this point, the Google auto complete has narrowed down the addresses to just one and Hill selects that one. Again, notice the keypad open in the lower section of the screen. No Terms of Use visible
- **Exhibit N** – Hill spends one second on the Webpage before clicking the "change" link. This can be seen on the Active Prospect video between 2 min's 5 sec and 2 min and 6 sec (**Exhibit O** – note that red boxes have been overlaid to indicate the time as well as location of the "Change" link). The Terms of Use are visible toward the bottom of the screen during this second.

//
//

DECLARATION OF EXPERT ALEXANDER YOUNG PAGE No. 9

- **Exhibit P** – Hill has now clicked the "Change" link and the City, State, Zip Code fields appear and push the Terms of Use link off the bottom of the screen and it is no longer visible.

**Conclusion**

44. One could argue that lead generation websites from larger brands place language that would bind you to certain terms in a non-conspicuous place and that establishes a standard. Items such as terms or policies are considered an impediment to a site visitor completing their interaction with a form. That is why they are not conspicuous. However, Hill's interaction with the Webpage in question is the only one that I am asked to verify.

45. One has to think of Hill as the average site visitor and measure the conspicuousness of the Terms of Use (shown in a small font) with that understanding. Yes, the Terms of Use link was visible for up to a single second. But where were her eyes during that time? A site visitor would have his or her eyes where they would have just been entering text into the form. In her case, where the address is being selected. In the following second, she moves her eyes to the "change" link, clicks that and the Terms of Use link is no longer visible.

46. The question is not whether the Terms of Use link was on the Webpage or not, but whether it was conspicuous enough for Hill to have been aware of it. Merriam-Webster defines conspicuous as "obvious to the eye or mind." Visibility of the Terms of Use link was far from obvious to Hill. Completing this journey as Hill would have, I can conclude that Hill was not offered any reasonable opportunity to see the Terms of Use link and know that she would be bound by the Terms of Use.

### VISIBILITY OF TERMS OF USE ON THE LOWERMYBILLS.COM PAGE

47. Using the same reconstruction method as above, I started with the video produced by Jornaya (referenced in the Declaration of Manny Wald) to extract a screenshot of what was presented to Hill. (*See* **Exhibit Q**).

DECLARATION OF EXPERT ALEXANDER YOUNG   PAGE NO. 10

48. The screenshot measured 394 X 630 pixels and to stretch it to 400 pixels wide, the height was adjusted to 639 pixels (400/394 X 630).

49. On that site too, the Terms of Use link is not visible to the site visitor and is hidden further down the screen.

50. On 12-24-19 I received an email sent to a personal email address of mine that was never used in any of my testing or in any interaction with either of the websites in question. I have no record of any email related to LowerMyBills.com prior to this one. The email was sent from an email address with the name LowerMyBills referencing the website LowerMyBills.com in the email body as a solicitation for a mortgage refinance. The link went to the lowermybills.com website.

51. As an additional datapoint, I decided to test this journey to see if there would be visibility to the Terms of Use. I checked it on my own phone, an iPhone, as well as emulating a Pixel using Browserstack. The Terms of Use were not conspicuous on either the iPhone or the Pixel (**Exhibit R**).

<u>**DID HILL CLICK THE "SEE MY RESULTS" BUTTON?**</u>

**The Webpage – A Multi-Step Form**

52. The Webpage in question collects the form field data ("Have you or your spouse served in the military?" etc.) every time the "Next" button is clicked. It does not request a new page from the webserver every time the "Next" button is clicked. This can be verified by reviewing the address of the page (Uniform Resource Locator or URL) in the browser's address bar. It starts out as https://lmb.yourvasurvey.info/ and when clicked, the address remains https://lmb.yourvasurvey.info/. An anchor (a reference to a point on a webpage) is added as one steps through to indicate which portion of the page should be shown – e.g. https://lmb.yourvasurvey.info/#property-step-refinance indicating that the site visitor should be shown that particular portion of the page. Using code on the page – CSS (Cascading Style Sheets) and JavaScript, the rest of the form is hidden from

the site visitor and it creates the illusion that one is stepping from one page to the next. These types of forms are called multi-step forms and are an implementation of what's known as a single page application as all the steps of the form are presented on a single page.

53. It is only on the last frame that the clicking of the "See my results!" loads a new page in the browser - https://lmb.yourvasurvey.info/usl-thankyou.html ("Thank You Page").

54. For a site visitor's data (all the fields they filled out or selections they made on the form) to be submitted to the webserver using this approach, the data would typically be sent to the webserver when the user clicked the final button ("See my results") and was then directed to the Thank You Page.

55. If there is no evidence of the user being shown the Thank You Page then the site visitor, in this case, Hill, did not click the button.

**What Evidence is Available to Review**

56. To support the tracking of Hill's journey on the Webpage, Defendant has submitted two videos through the Declaration of Manny Wald ("Jornaya Video") and the Declaration of Steven M. Rafferty ("Active Prospect Video").

57. As previously stated, in his declaration regarding the Active Prospect Video of Hill's site visit to the Webpage, Mr. Rafferty notes, in paragraph 4, that:

> A TrustedForm certificate of authenticity includes a video replay of the user's interaction with the page where the script is present. The video replay works by capturing a copy of the webpage and recording all of the user's interactions with the webpage, including any personal information that the consumer inputs, mouse movements, clicks as they happen in real-time, and changes made to the webpage in response to consumer inputs.

58. Paragraph 5 continues with, "Enclosed hereto as Exhibit A is a true and correct copy of the video replay."

59. The Active Prospect Video is 2 minutes and 16 seconds long. It opens with the first question asked on the Webpage and ends with the final frame showing the See My Results button.

60. In the declaration of Manny Wald, Mr. Wald states in paragraph 4:

> The Visual Playback is a visual rendering of the actual lead creation event, **showing exactly what the consumer did as they completed the lead creation form**. Throughout the lead creation event, every time the client's webpage loads or changes, Jornaya's script collects all form fields (the entered values which are hashed using a one-way hashing algorithm) and other data provided during a consumer's interaction on a lead creation form. This data is stored and can be retrieved to visually render the lead creation experience, including TCPA disclosure language presented to the consumer and the effect or progress on the webpage based on how they consented (for example, the effect or next page on the webpage resulting from the action needed to be taken by the consumer on the webpage; for example they **actively clicked or selected an electronic submission button**).

61. In the bolded parts (not bolded in the original declaration but done so here to draw attention to the pertinent areas), Mr. Wald affirms that his video shows "exactly what the consumer did."

62. The Jornaya Video is 2 minutes and 17 seconds long. It shows the same beginning and end as the Active Prospect Video with the final frame showing the See My Results button.

**Analyzing the Evidence – Jornaya**

63. What would the typical behavior of the Jornaya video recording be? Mr. Wald states that it would show "the effect or next page on the webpage resulting from the action needed to be taken by the consumer on the webpage; for example,

they actively clicked or selected an electronic submission button." (Wald Declaration, paragraph 4).

64. The "next page" resulting from the "action needed to be taken by the consumer" which is the clicking of a submit button; that next page would be the Thank You Page.

65. A site visitor is identified by Jornaya using what is referred to as a LeadId (https://www.jornaya.com/products/3p-tcpa-guardian/), which is disclosed as a 36-character unique identifier that is "generated the moment a customer lands on a webpage where our technology is installed." (https://support.jornaya.com/s/article/What-is-a-Universal-LeadiD-LeadiD-or-LeadiD-token). For instance, Wald declares Hill's LeadID in his declaration, in paragraph 5, as F3FF3E56-DECF-B906-0587-19AB7E187891.

66. Using a website that implements the Jornaya code, https://www.affordable-health-insurance-plans.org/, I reviewed the typical Jornaya functionality. This website has three pages. The initial page as it is loaded (https://www.affordable-health-insurance-plans.org/), a second page requesting more information (https://www.affordable-health-insurance-plans.org/HealthShort) and the page that loads once the site visitor clicks the final button (https://www.affordable-health-insurance-plans.org/Exit).

67. **Exhibit T** shows the page when it loads as is seen on the red box over the address in the address bar. The information to the right of the page shows network traffic. These are communications from the site visitor's computer or phone to webservers, which either send or request information and/or data.

68. The red box on the right show the LeadID created for this site visit and communicated to Jornaya. The LeadID in this visit is C3A24F3B-687A-D2EC-E09D-155C4FF4EBC8.

69. **Exhibit U** shows the second page, "HealthShort" as is indicated by the red box over the address bar. Again, the same LeadID is shown to the right as the

site visitor's interaction with the page (form data) is submitted to Jornaya to create the video showing the site visitor's journey.

70. **Exhibit V** shows the final page that loads after the site visitor clicks the "Submit" button as can be seen in the address bar as "Exit." Again, the same LeadID is shown. This is the equivalent of the Thank You Page and shows that the Jornaya system collected data for this site visit past the clicking of the "Submit" button and that click would therefore be visible in the video Jornaya would produce for that LeadID.

71. To further drive home the certainty that the LeadID remains alive and known, **Exhibit W** shows that it is stored in a cookie. A cookie is a file that is accessible from one page to the next as one clicks through on a website and allows the programmers of that website to access certain pieces of information such as whether someone already checked a "this site uses cookies" banner that is often seen on the first page of a website so that it's not shown again after being clicked or, in this case, the LeadID.

**Analyzing the Evidence – Active Prospect**

72. To test the evidence differently, I decided to review the action the Active Prospect code takes on the Webpage visited by Hill.

73. Like Jornaya's LeadID, Active Prospect uses a unique identifier called the certificate id to uniquely identify a site visitor's recording. As example, for the Hill visit to the Webpage, the Rafferty Declaration indicates her certificate id as 256569a7d85fb891a065dad7f219f7ad5c8b0dea in paragraph 5.

74. As seen on **Exhibit X**, on the Thank You Page, a reference to a certificate id of 90359211061db7a88307600fa412be6ba73341ec is seen. This can be seen as shown in the code after the Thank You Page has loaded by noticing the red box over the thankyouGCR.html in the address bar, the indicator higher up in the network trace with the red box showing the page was already requested and the visual of the page on the left.

75. I accessed the video using the Active Prospect URL https://cert.trustedform.com/90359211061db7a88307600fa412be6ba73341ec#certificate as seen on **Exhibit Y**. That video indicates the page as https://lmb.yourvasurvey.info/. A screenshot of the video on **Exhibit Z** confirms this.

76. That confirms that the Thank You Page has knowledge of the certificate id from the previous page where the form data was entered.

77. A second certificate id was also present on that page as can be seen on **Exhibit AA** as 34ccb62c62103456530be91db8fd8ab855b0d7b2. This separate video was also accessed by me and as can be seen as **Exhibit BB**, this video is for the Thank You Page (https://lmb.yourvasurvey.info/thankyouGCR.html).

78. Note that identifying information connecting the two videos is seen in the partially redacted IP address that is the same on both videos.

79. I'm also aware that Active Prospect states in a support article (https://support.activeprospect.com/hc/en-us/articles/202917569-TrustedForm-s-snapshot-and-video-replay) that "TrustedForm stops recording once the web form submits executes and the page is redirected/refreshed. This typically occurs when a user clicks the 'submit' button after entering the required information into the form." That would seem to indicate that the recording would end prior to showing the Thank You Page, however, this would not allow for the confirmation that the "submit" button was pressed. It should therefore be assumed that the video would cease once the new page is loaded and that is visible on the video. Additionally, on Active Prospect's own website (https://activeprospect.com/products/trustedform/), the example video shown on that page is of a video where one can see a site visitor filling out a form, clicking a submit button and seeing "Thanks!" That is the expected behavior. Anything short of seeing the Thank You Page implies that the button was not clicked. I have to therefore assume that their support article is misleading, unclear or out of date.

**Conclusion of the "See my Results" Button**

80. Defendant produced two items that depict Hill's interaction with the Webpage. It is from these evidentiary items and the review of their behaviour that I use to produce a conclusion of certainty.

81. Active Prospect says that it helps compliance by "Documenting consumer consent" (https://activeprospect.com/products/trustedform/). We can also see from the code on the Webpage that a second video is recorded. The absence of that video in Defendants declarations is further proof of the lack of the button being clicked. If the Thank You Page didn't load, the button was not clicked. There is no visual affirmation of consent.

82. Wald declared that Jornaya would show exactly what the consumer did including the next page (declaration of Manny Wald, Mr. Wald paragraph 4). I verified his claim to be accurate by analyzing how their code operated on another website implementing their solution. Their video of Hills journey also shows no loading of the Thank You Page, once again showing that the button was not clicked.

83. Furthermore, both videos show the same user behaviour and are mutually consistent – they both show Hill entering the final frame of the form at 1 minute and 31 seconds. Both videos show the final address information entered at 2 min 5 seconds. Hill adjusts the Street Address field to remove "wildomar" and no further user interaction is observed. Both videos end with the Webpage and "See my Results!" button still visible. This behaviour is consistent with Hill not submitting the button, but rather abandoning the page.

84. Without showing the button being clicked, how are these services documenting consumer consent? Simple – Hill did not click the button. Hill did not consent.

85. Based on all the evidence I reviewed as well as my 20+ years actively involved in the design and operation of websites, I can conclude with technical

certainty and using multiple sets of evidence that Hill did not click the "See my Results!" submit button on the Webpage.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was signed on April 7, 2020 in Chicago, Illinois.



By: _____
Alexander Young