# EXHIBIT A



# EXPERT REPORT
# OF ALEXANDER YOUNG

*Hill et al. v Quicken Loans Inc.*

*Case No. 5:19-cv-00163-FMO-SP (C.D. Cal.)*

01-17-20

# Table of Contents

Credentials and Experience .................................................................................................................. 2

The Engagement .................................................................................................................................. 3

Materials Reviewed ............................................................................................................................. 3

The Methodology – two approaches .................................................................................................... 3

    What device was Hill using? ............................................................................................................. 4

    Approach one – reconstruction ........................................................................................................ 4

    The Reconstruction .......................................................................................................................... 5

    Approach two – the site visit ........................................................................................................... 6

Visibility of Terms of Use on the lowermybills.com page .................................................................... 8

Best practice with regards to confirming a site visitor has consented to terms ................................. 9

Did Hill click the "See my results" button? ....................................................................................... 10

Exhibits .............................................................................................................................................. 12

    Exhibit A ......................................................................................................................................... 12

    Exhibit B ......................................................................................................................................... 13

    Exhibit C ......................................................................................................................................... 14

    Exhibit D ......................................................................................................................................... 15

    Exhibit E ......................................................................................................................................... 16

    Exhibit F ......................................................................................................................................... 17

    Exhibit G ......................................................................................................................................... 18

    Exhibit H ......................................................................................................................................... 19

    Exhibit I .......................................................................................................................................... 20

    Exhibit J .......................................................................................................................................... 21

    Exhibit K ......................................................................................................................................... 22

    Exhibit L ......................................................................................................................................... 23

    Exhibit M ........................................................................................................................................ 24

    Exhibit N ........................................................................................................................................ 25

    Exhibit O ........................................................................................................................................ 26

    Exhibit P ......................................................................................................................................... 27

    Exhibit Q ........................................................................................................................................ 28

    Exhibit R ......................................................................................................................................... 29

    Exhibit S ......................................................................................................................................... 30

    Exhibit T ......................................................................................................................................... 31

    Exhibit U ........................................................................................................................................ 33

    Exhibit V ........................................................................................................................................ 34

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  1

20

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

## Credentials and Experience

I am the Chief Strategist with ePageCity, Inc. ("ePageCity"), a market leading creative agency that has been engaged exclusively in website design, development and digital marketing services since 1999 and I am one of the co-founders.

ePageCity, under my tenure, has launched over 1,000 websites ranging from simple to very complex. A sub-brand agency, Deep Footprint (a DBA of ePageCity) engages in digital marketing services that include user experience testing to validate an appropriate user experience. I hold the title of Chief Strategist to that agency too.

Both agencies have been ranked as leaders by the creative industry leader aggregators.

At ePageCity, I have been the lead strategist on solving multiple user experience as well as user interface issues. These required a keen understanding of web technology and user interaction.

During my time at ePageCity, I have personally authored over 3,000 proposal pages for both website and digital marketing programs and have been personally responsible for the majority of the firm's revenue.

I hold a Bachelor's degree with a double major in Computer Science and Business Economics and a minor in Tax from the University of Stellenbosch in South Africa and a post-graduate Master's equivalency, obtained cum laude, from the same.

My credibility as an expert was tested during a motion to exclude my report and testimony in a case requiring me to review a similar situation; Karpilovsky v. All Web Leads, Inc., No. 17 C 1307, 2018 U.S. Dist. LEXIS 105259, at *11 (N.D.Ill. June 25, 2018). Judge Leinenweber denied Plaintiff's motion to exclude and ruled me and my report credible.

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  2
21

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

**ePageCity**
WEB DESIGN & SEARCH OPTIMIZATION

## The Engagement

I have been retained by Kazerouni Law Group, APC to research and report on my findings as to whether it is reasonable to assume that the plaintiff Amanda Hill ("Hill") in Hill et al. v Quicken Loans Inc. ("Defendant"), Case No. 5:19-cv-00163-FMO-SP (C.D. Cal.) would have seen the terms of use ("Terms of Use") link located on the page ("Webpage") with the "See my results!" submit button on the website as disclosed in Defendant's Motion to Compel Arbitration.

I was also asked to comment on best practices with regard to the receiving of an affirmation that a site visitor has accepted any terms of service that the submission of an online form would bind them to.

Lastly, I was asked to provide my opinion as to whether I could ascertain whether Hill clicked the "See my results!" button on the Webpage.

## Materials Reviewed

I was provided case documents concerning this matter that included the Motion to Compel Arbitration (Dkt. No. 29-5) ("Motion to Compel Arbitration"), the Opposition to Defendant Quicken Loan Inc.'s Motion to Compel Arbitration, the Reply in Support of Quicken Loan Inc.'s Motion to Compel Arbitration, supporting declarations thereto and videos referenced by Defendant Quicken Loans Inc., documents from non-party LMB Mortgage Services, Inc. in response to a document subpoena from Plaintiff Gayle Hyde produced December 11, 2019 ("Hill All Customer Inquiry Data"), as well as two declarations produced by Defendant entitled Declaration of Manny Wald and Declaration of Steven M. Rafferty. In addition, I reviewed the two website properties visited by Hill as well as other websites that serve as lead generation sources as these two websites do.

## The Methodology – two approaches

I used two approaches to verify whether it is reasonable to deduce whether Hill would have seen the Terms of Use. The first approach took provided materials and reconstructed the experience based on those materials.

The second approach was to travel through the current Webpage to recreate the journey Hill would have taken so as to observe the visibility of the Terms of Use.

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  3

22

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

**ePageCity**
WEB DESIGN & SEARCH OPTIMIZATION

EXPERT REPORT OF ALEXANDER YOUNG 01-17-20

## What device was Hill using?

Understanding which device is a vital step as different mobile devices have screens of different shapes and some may show more or less content than others.

According to Hill All Customer Inquiry Data, Hill visited the Webpage on 10/10/2018. The spreadsheet includes additional information identifying the device used by Hill to access the Webpage. The following pertinent data points are shown;

- (DA) Browser Name            Chrome Mobile
- (DA) Browser Version         69.0.3497.100
- (DA) Diagonal Screen Size    5
- (DA) Display PPI             441
- (DA) Manufacturer            HTC
- (DA) Model                   Pixel
- (DA) Year Released           2016
- (DA) OS Name                 Android

The model, release date and screen specifications very specifically indicate that Hill was using a first-generation Pixel phone using the Chrome browser.

A review of changes to the Chrome browser from the version noted until current shows no changes that would impact the visual rendering of elements on the screen.

## Approach one – reconstruction

Reconstructing the environment would require knowledge of what the Webpage looked like that Hill was presented with, the browser as well as device she was using to understand how much of the Webpage she was seeing. The browser and device were already known at this point.

Paragraph 7 of the Motion to Compel Arbitration states

> "Attached as Exhibit 1 to this Declaration are true and correct copies of screenshots reflecting the information entry process that would have been presented to a consumer who navigated to the YourVASurvey.Info website on October 10, 2018…"

A copy of the screenshot on page 17 of Exhibit 1, above, is shown as Exhibit A.

With that ascertained, I would retain the aspect of the screenshot provided by Defendant and overlay that into an electronic copy of the frame of the device, thus displaying what would have been visible and what would not have been in the viewport. The viewport being the visible area of a web page on a device with content that you would need to scroll to considered to be outside the viewport.

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page 4

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

23



## The Reconstruction

Taking the screenshot provided by Defendant and scaling it to show what would be visible to Hill required adjusting the size of the screenshot while maintaining the aspect ratio.

The Pixel phone has an aspect ratio of 16:9 (measured either in inches – 2.5 X 4.4 inches, 411 x 731 density independent pixels or resolution at 1080 X 1920) and shows 5 inches diagonally (see Exhibit B). So, for every 9 horizontal points, there are 16 vertical points of equal size to maintain the correct aspect (so that content isn't stretched or squashed). This means that the screenshot can be shown with the diagonal physical dimension being less or more than 5 inches as long as the 16:9 aspect ratio is maintained and that the content in the viewport would be resented at the same position, just larger or smaller.

As an example, the image on page 4 of the Motion to Compel Arbitration (see Exhibit C) you can notice that the aspect has not been maintained and the image has been shrunk vertically which gives the illusion that more vertical content is displayed.

Three source screenshots exist; Exhibit 1, page 17 from the Defendant's Motion to Compel Arbitration (my Exhibit A), Exhibit F of Hedin Decl. ISO Response in Opposition to Mtn to Compel Arbitration (Dkt. No. 38) taken 05-09-19 (shown as my Exhibit D) and a screenshot I took using an industry-leading browser emulator, Browserstack, emulating the Pixel phone taken on 12-12-19 of the Webpage (Exhibit E).

The following differences can be noticed to the visual area – between 10-10-18 and 05-09-19, the "see my results" button was changed from blue to green and text treatment to the heading was changed. These could be in the normal process of A/B testing (the process of testing two very similar marketing pieces to measure which would be considered more effective) but yielded no locational change to any of the elements. None would have impacted the location of the link to the Terms of Use.

Sometime after 05-09-19 and before 12-12-19, an additional field was added for Secondary Phone Number. This would have pushed the placement of the Terms of Use further down in Exhibit E compared to Exhibits A and D.

Other than that change, which could be adjusted for in the screenshot, it is my determination that the placement of the Terms of Use on that web page was determinable as any change to the visual layout could be adjusted in measurements.

As the Webpage on 12-12-19 was changed to have the Secondary Phone number field, to be more accurate in determining what Hill saw, I took the Defendant's screenshot in Exhibit A and scaled it to maintain the 16:9 aspect ratio.

I used a screenshot of that image (Exhibit A) measuring 322 X 714 pixels and scaled it up to have the same 400 pixel width as the Browserstack image (Exhibit E), that would require stretching it to 400 X 886 using the formula 400/322X714 for the height to maintain the 16:9 ratio. That would ensure that the same content Hill would have seen on the Webpage would be visible.

This was then placed over the Exhibit E Pixel frame resulting in Exhibit F.

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page 5

24

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

epagecity
WEB DESIGN & SEARCH OPTIMIZATION

EXPERT REPORT OF ALEXANDER YOUNG 01-17-20

I can conclude that the Terms of Use is not visible on the screenshot I took on the site on 12-12-19 (Exhibit E) and the Terms of Use would not be visible on the screenshot as provided by Defendant (Exhibit F) on the phone used by Hill during the October 2018 visit.

## Approach two – the site visit

On 01-13-20 I visited the original Webpage URL – yourvasurvey.info and found that the site had changed since my 12-12-19 visit in a manner that the page before the Webpage (Exhibit G) asked for an address prior to clicking to the Webpage. The Webpage no longer asked for the address there. Incidentally, the Terms of Use was still not visible (Exhibit H).

I then visited the website referred to in Hill All Customer Inquiry Data provided by Defendant under their field titled "site" which noted the site as lmb.yourvasurvey.info. I had visited this site on 12-17-19 and had made a copy of the HTML, one of the sources of code used to render the page.

On my comparative review of what the site looked like on 12-17-19 compared to 01-13-20, there were changes noted. Other than standard cosmetic adjustments and A/B testing as seen in the center versus left alignment of the form labels (First Name, etc.), a blue versus green submit button, small adjustments to the verbiage at the top of the page. This is consistent with A/B testing and code for A/B testing is present in the HTML of the Webpage. See code in Exhibit I.

Some changes were not typical of A/B testing and are more structural and assumed to be wholesale to all pages being tested. For instance, language for the California Consumer Protection Act (CCPA) added to the footer is a change that would be on any version of the Webpage. Some lender options in the dropdown boxes were also updated. Noticeably, the secondary phone number seen on Exhibit E was no longer present. There was scrolling of content that occurred as fields were being entered not seen in the video or observed on the Webpage (at yourvasurvey.info compared to this page at lmb.yourvasurvey.info) as visited on 12-12-19

To verify that nothing else had changed, I decided to complete the form following the steps Hill had taken using the video referenced in the Rafferty Declaration. Therein, Mr. Rafferty notes, in paragraph 4, that;

> "A TrustedForm certificate of authenticity includes a video replay of the user's interaction with the page where the script is present. The video replay works by capturing a copy of the webpage and recording all of the user's interactions with the webpage, including any personal information that the consumer inputs, mouse movements, clicks as they happen in real-time, and changes made to the webpage in response to consumer inputs."

Paragraph 5 continues with;

> "Enclosed hereto as Exhibit A is a true and correct copy of the video replay"

This statement clarifies that Hill's interaction on the Webpage was as shown on that video. It's a true and correct copy.

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page 6
25

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

The visual presentation of the live lmb.yourvasurvey.info Webpage compared to the Active prospect video as referenced in the Rafferty Declaration (Exhibit J) and the screenshots referenced in Exhibits A, C and D is the same and therefore Hill's journey could be mimicked on the current website.

Completing the form as Hill did (using the same data for the address as Hill did), one can step through what Hill would have seen.

The journey on the Webpage would have taken place as follows;

- Exhibit K – The Webpage as it first loads – no Terms of Use visible
- Exhibit L – The Webpage after the phone number is typed - no Terms of Use visible (note the keypad has popped up in the lower section of the screen)
- Exhibit M – The Webpage once the address has been typed as visible in the Active Prospect video at 2 min's and 5 seconds. At this point, the Google auto complete has narrowed down the addresses to just one and Hill selects that one. Again, notice the keypad open in the lower section of the screen. No Terms of Use visible
- Exhibit N – Hill spends one second on the Webpage before clicking the "change" link. This can be seen on the Active Prospect video between 2 min's 5 sec and 2 min 6 sec (Exhibit O – note that red boxes have been overlaid to indicate the time as well as location of the "Change" link). The Terms of Use are visible toward the bottom of the screen during this second.
- Exhibit P – Hill has now clicked the "Change" link and the City, State, Zip Code fields appear and push the Terms of Use link off the bottom of the screen and it is no longer visible.

Completing this journey as Hill would have, I can conclude that Hill was not offered any reasonable opportunity to see the Terms of Use link and know that she would be bound by the Terms of Use.


## Visibility of Terms of Use on the lowermybills.com page

Using the same reconstruction method as above, I started with the video produced by Jornaya (referenced in the Declaration of Manny Wald) to extract a screenshot of what was presented to Hill. (See Exhibit Q). The screenshot measured 394 X 630 pixels and to stretch it to 400 pixels wide, the height was adjusted to 639 pixels (400/394 X 630).

On that site too, the Terms of Use link is not visible to the site visitor and is hidden further down the screen.

On 12-24-19 I received an email sent to a personal email address of mine that was never used in any of my testing or in any interaction with either of the websites in question. I have no record of any email related to LowerMyBills.com prior to this one. The email was sent from an email address with the name LowerMyBills referencing the website LowerMyBills.com in the email body as a solicitation for a mortgage refinance. The link went to the lowermybills.com website.

As an additional datapoint, I decided to test this journey to see if there would be visibility to the Terms of Use. I checked it on my own phone, an iPhone, as well as emulating a Pixel using Browserstack. The Terms of Use were not conspicuous on either the iPhone or the Pixel (Exhibit R).

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  8

27

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



## Best practice with regards to confirming a site visitor has consented to terms

There are certain accepted best practices that are taken into account when expecting a user to consent to terms and/or be familiar with any terms or restrictions prior to submitting their information on an interactive form such as that on the page under scrutiny.

The key element is a clear indication that the user has 1) read any terms to which the submission is binding the user and 2) clearly provided consent to those terms.

These are achieved in separate best practices.

Users do not scroll past a natural CTA (call to action) like a submit button. That's their last action and they have no need to look for content beyond that point. For the visibility of consent language or terms, such terms need to be presented in a location that will be conspicuous to a site visitor and using a font size that is readable as well as a font to background color that has sufficient contract to be visible.

Two best practices exist in ensuring this; 1) the content is visible ahead of the submit button on all devices or 2) the form uses a click to next page style wizard to collect form information and on one of those clicked-through pages the consent language appears clearly.

To confirm consent, a checkbox is typically placed alongside the language with an indicator that if the checkbox is checked, the site visitor is consenting to the language/terms. If the checkbox is not clicked and the user clicks the submit button, the page has been programmed to produce a warning that this form has not been submitted because the language was not consented to. Only when the site visitor checks the box and clicks submit will the form actually be submitted as confirmation has been received that the site visitor read and understood the language.

Incidentally, on a page preceding the Webpage in question, a form asks for an email address and seems to implement clickwrap (requiring a checkbox be clicked to affirm), however, clicking "next" without checking that box does not produce any error and allows the site visitor to continue to the next page. See Exhibit S.

A common additional best practice is to disallow the submission of forms where the user has disabled any JavaScript code in their browser as it is common to use JavaScript code to provide the non-submit error when the checkbox has not been checked.

Many examples of the application of the best practice can be found. As example, you'll notice in both examples noted in Exhibit T, consent language is visible to the site visitor and failure to check the box indicating consent results in an error message displaying the lack of consent and the form data is not submitted.

It should be noted that there are also best practices that are used when creating these lead generation websites that are focussed on maximizing the likelihood of receiving a lead. These include removing or obfusicating any elements that could lower the chance of a site visitor completing the form and submitting their results by clicking the submit button. Hiding items like consent language or terms of service in areas not likely to be seen by the site visitor, reducing the font size and lowering the visibility of the font color or decreasing the contrast between foreground and background colors.

Alex Young

Chief Strategist

alex@epagecity.com // 312.291.2211

Page  9

28

ePageCity, Inc.

4541N Ravenswood Ave.

Chicago, IL 60640



These are all commonly seen on lead generation websites and are all best practices for maximizing conversion, not best practices in confirming a site visitor has sufficient knowledge regarding the terms they are binding themselves to.

## Did Hill click the "See my results" button?

A web form that collects data on a web page such as the Webpage in question would typically send (submit) that data to the webserver by an action. That action is typically by the click of a button. This button has a default name of "submit". That's what you'll see on most web forms such as online donation forms, contact forms, etc.

On the Webpage in question, the name has been changed from the standard "submit" to something that is more of a call to action; "See my results!". That is standard practice to entice the site visitor to actually submit their data to the webserver.

When the button is pressed, a call is made to the webserver passing along the data and returning the site visitor to an "action" page which is typically one that conveys a message that the website would like to inform the site visitor of once the form is submitted. For example, an online donation would have "Thank you" type content or a contact form submission would return a page saying "we'll get back to you soon".

In reviewing the code on the Webpage in question, the standard method of submitting the form data (the values such as name, phone, address, etc.) is not being used. The code that reacts to website behavior, JavaScript, is contained in a file called combined.js. Within this, there is code (Exhibit U) that submits data on actions not associated to the site visitor clicking the "See my results!" button.

That aside, if one does click that button, the page that you're directed to is https://lmb.yourvasurvey.info/tel-thankyou.html with parameters attached as shown in Exhibit V and is aptly called "Thank you".

As previously stated, in his declaration regarding the Active Prospect video of Hill's site visit to the Webpage, Mr. Rafferty notes, in paragraph 4, that;

> "A TrustedForm certificate of authenticity includes a video replay of the user's interaction with the page where the script is present. The video replay works by capturing a copy of the webpage and recording all of the user's interactions with the webpage, including any personal information that the consumer inputs, mouse movements, clicks as they happen in real-time, and changes made to the webpage in response to consumer inputs."

Paragraph 5 continues with;

> "Enclosed hereto as Exhibit A is a true and correct copy of the video replay"

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  10
29

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



In the declaration of Manny Wald, Mr. Wald states in paragraph 4;

> "The Visual Playback is a visual rendering of the actual lead creation event, **showing exactly what the consumer did as they completed the lead creation form**. Throughout the lead creation event, every time the client's webpage loads or changes, Jornaya's script collects all form fields (the entered values which are hashed using a one-way hashing algorithm) and other data provided during a consumer's interaction on a lead creation form. This data is stored and can be retrieved to visually render the lead creation experience, including TCPA disclosure language presented to the consumer and the effect or progress on the webpage based on how they consented (for example, the effect or next page on the webpage resulting from the action needed to be taken by the consumer on the webpage; for example they **actively clicked or selected an electronic submission button**)."

In the bolded parts (not bolded in the original declaration, but done so here to draw attention to the pertinent areas), Mr. Wald not only affirms that his video shows "exactly what the consumer did", but he states that it will also show if the site visitor "actively clicked or selected an electronic submission button".

So, what one would expect to see at the end of both these videos is the "Thank You" page as shown in Exhibit V.

Both videos show the Webpage open at 1 min 31 seconds. Both videos show the final address information entered at 2 min 5 seconds. Hill, adjusts the Street Address field to remove "wildomar" and no further user interaction is observed.

Instead, the videos both end with the Webpage and "See my Results!" button still visible. A behaviour consistent with Hill not submitting the button, but rather abandoning the page.

Additionally, the Jornaya video in the Declaration of Manny Wald displaying the journey followed by Hill on the lowermybills.com website does show a final page which validates Mr. Wald's assertion that his software would show if the site visitor "actively clicked or selected an electronic submission button".

There would be no reason why the two Jornaya videos would not be consistent.

I can conclude with technical certainty and using multiple sets of evidence that Hill did not click the "See my Results!" submit button on the Webpage.

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  11
30

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

## Exhibits

### Exhibit A



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page 12

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

31



Exhibit B



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page 13

32

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640


Exhibit C




WEB DESIGN & SEARCH OPTIMIZATION

Exhibit D



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  15

34

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



Exhibit E



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  16

35

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



Exhibit F



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  17

36

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



Exhibit G



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  18

37

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



Exhibit H



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  19

38

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



Exhibit I

```
<!DOCTYPE html><html lang="en"><head><title>VA Survey</title><m
    var account_id = 364281,
        settings_tolerance = 1500,
        library_tolerance = 2000,
        use_existing_jquery = false,
        is_spa = 1,
        hide_element = 'body',

        /* DO NOT EDIT BELOW THIS LINE */
        f = false, d = document, code = {
          use_existing_jquery: function () { return use_exist
            window.settings_timer = setTimeout( '_vwo_code.fi
            }
        }; window._vwo_settings_timer = code.init(); return c
    }() );</script><!-- End VWO Async Smartcode --><!-- Googl
ss="button-list vertical-list"><input type="radio" id="military
n a-btn" id="purchase-button-label"><p>No, I'm looking to buy</
er-container"><h4 class="question">What type of home do you hav
```

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  20

39

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640


Exhibit J



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  21

40

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



Exhibit K



Alex Young

Chief Strategist

alex@epagecity.com // 312.291.2211

Page  22

41

ePageCity, Inc.

4541N Ravenswood Ave.

Chicago, IL 60640



Exhibit L



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  23

42

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

Exhibit M



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  24

43

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

Exhibit N



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page 25

44

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



Exhibit O





Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  26

45

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



Exhibit P



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page 27

46

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



EXPERT REPORT OF ALEXANDER YOUNG 01-17-20

Exhibit Q





Exhibit R



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  29

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

48



**EXPERT REPORT OF ALEXANDER YOUNG 01-17-20**

Exhibit S



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  30

49

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



## Exhibit T

https://americarequotes.com/insurance/insurance-quotes/



**Below: Warning Message – cannot submit request without checking to agree to disclaimer.**



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  31

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

50



EXPERT REPORT OF ALEXANDER YOUNG 01-17-20

https://www.vitalonehealth.com/quotes/my-quote



Below: Warning Message – cannot submit request without checking to agree to disclaimer.





## Exhibit U

```
function submitFormData(e, t) {
    checkForUUID();
    var a = storage("session", "get", "scUUID"),
        n = $("[name=tcpa]").val(),
        s = "https://external" + envToggle + ".printfinger.tech:7113/api/BuyerPreQualification",
        o = {
            BuyerName: n,
            Uuid: a,
            Payload: e
        },
        i = function(e) {
            var a = JSON.parse(e);
            try {
                null === a.TierLevel && void 0 === a.TierLevel || (console.log("TL Res: " + a.TierLevel), storage("session", "set",
"tl", a.TierLevel)), doPartialSave(current_form)
            } catch (e) {
                console.log(e)
            }
            t && t()
        };
    if (callDotRMP) {
        var r = o.Payload,
            l = postToCakeEndpoint(envToggle, "rmp");
        postDirectlyToCake(rmpToCakeTranslation(r), l, i, v2ExternalAuthkey, a, "POST")
    } else sendSyncRequest(o, s, i, v2ExternalAuthkey, a, "POST")
}
var placeSearch, autocompleteRefinance, autocompletePurchase, autocompleteAuto, autocompleteMobileAuto,
autocompleteWindows, buildProfile = function(e, t) {
        submitFormData(e);
```

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  33
52

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640



Exhibit V



Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

Page  34

53

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

Case 3:19-cv-00163-FMO-SP   Document 95-2   Filed 04/27/20   Page 37 of 39   Page ID #:1369
**EXPERT REPORT OF ALEXANDER YOUNG 01-17-20**

WEB DESIGN & SEARCH OPTIMIZATION

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief, and that this declaration was executed in Chicago, Illinois, this 17th day of January, 2020.

Alexander Young

Alex Young
Chief Strategist
alex@epagecity.com // 312.291.2211

54

ePageCity, Inc.
4541N Ravenswood Ave.
Chicago, IL 60640

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Suite D1, Costa Mesa, CA 92626. On January 17, 2020, I served the herein described document(s):

### EXPERT REPORT OF ALEXANDER YOUNG
*Hill et al. v. Quicken Loans Inc.*
*Case No. 5:19-cv-00163-FMO-SP (C.D. Cal.)*
**07/17/20**

☒    MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Costa Mesa, California addressed as set forth below.

William Kyle Tayman
KTayman@goodwinlaw.com
Goodwin Procter LLP
901 New York Avenue
Washington, DC 20001
*Counsel for Defendant Quicken Loans, Inc.*

Brooks R. Brown
BBrown@goodwinlaw.com
Goodwin Procter LLP
601 South Figueroa Street 41st Floor
Los Angeles, CA 90017
*Counsel for Defendant Quicken Loans, Inc.*

Yvonne W. Chan
ychan@goodwinlaw.com
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
*Counsel for Defendant Quicken Loans, Inc.*

Jeffrey B. Morganroth
jmorganrith@morganrothlaw.com
Morganroth & Morganroth, PLLC
344 North Old Woodard
Avenue, Suite 200
Birmingham, MI 48009
*Counsel for Defendant Quicken Loans, Inc.*

I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct.  Executed on January 17, 2020, at Costa Mesa, California.


 */s/ Bryanna Rodriguez*
Bryanna Rodriguez