# EXHIBIT B

BROOKS R. BROWN (SBN 250724)
bbrown@goodwinlaw.com
W. KYLE TAYMAN (*pro hac vice*)
KTayman@goodwinlaw.com
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC  20036
Tel.: +1 202 346 4000
Fax: +1 202 346 4444

JEFFREY B MORGANROTH (*pro hac vice*)
jmorganroth@morganrothlaw.com
**MORGANROTH AND MORGANROTH PLLC**
344 North Old Woodard Avenue, Suite 200
Birmingham, MI  48009
Tel.: +1 248 864 4000
Fax: +1 248 864 4001

Attorneys for Defendant:
QUICKEN LOANS, LLC (F/K/A QUICKEN LOANS INC.)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| AMANDA HILL and GAYLE HYDE, individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUICKEN LOANS INC.,<br><br>Defendant. | Case No. 5:19-cv-00163-FMO-SP<br><br>**REBUTTAL TESTIMONY OF PHILIP GREENSPUN, Ph.D. PURSUANT TO MAY 11, 2020 ORDER**<br><br>Ctrm.:  6-D<br>Judge:  Hon. Fernando M. Olguin |

**REBUTTAL TESTIMONY OF PHILIP GREENSPUN, Ph.D.**

I, Philip Greenspun, declare and testify under oath as follows:

1. Pursuant to the Court's May 11, 2020 Order (ECF No. 99), I submit this Rebuttal Testimony in support of Quicken Loans' Motion to Compel Arbitration (ECF No. 29), and in response to the April 7, 2020 Declaration of Alexander Young submitted by Plaintiff Amanda Hill (ECF No. 94) (the "Young Declaration"). I previously submitted direct testimony by declaration in this matter on April 7, 2020 (ECF No. 93) (the "Greenspun Declaration"), which attached my rebuttal report (ECF No. 93, Ex. B) (the "Greenspun Report"). If called as a witness in this action, I could and would testify competently as to matters set forth herein.

2. Pursuant to the Court's May 11, 2020 Order (ECF No. 99), my rebuttal testimony below responds to paragraphs 44-46, 51, 66-71, 72-81 and Exhibits T-Z and AA-BB of the Young Declaration.

**A.   The Evidence Does Not Support Mr. Young's Testimony About Where Ms. Hill Directed Her Eyes on the LMB.YourVASurvey.Info Website.**

3. In his Declaration, Mr. Young opines (without citation) that when visiting LMB.YourVASurvey.info, an "average site visitor" "would have his or her eyes where they would have just been entering text into the form." Young Declaration ¶ 45. Assuming Hill is such an "average site visitor," he then concludes that for the period of time that Hill viewed the LMB.YourVASurvey.info website on October 10, 2018 (shown as Exhibit N to the Young Declaration), she directed her eyes only "where the address is being selected" and then "move[d] her eyes to the 'change' link . . . ." *Id.* Based on this assumption, Mr. Young further concludes that the "[v]isibility of the Terms of Use link was far from obvious to Hill" and that "Hill was not offered any reasonable opportunity to see the Terms of Use link and know that she would be bound by the Terms of Use." *Id.* ¶ 46.

4. Mr. Young cites no basis for his assumption that a site visitor such as Ms. Hill would (or even could) confine her vision to the specific portion of the

webpage where there was a text field, and in doing so, ignore the remainder of the webpage. Nor is this assumption reasonable in my experience because Ms. Hill viewed the webpage on a 5-inch screen on her mobile device. *See* Young Declaration Ex. B. As several studies confirm, website visitors are likely to scroll up and down on a webpage, including past the "call to action" (*i.e.*, a portion of the website where they are required to type information or click a button) in order to view *other* parts of the website.[1] *See* Greenspun Report ¶¶ 58-61; Greenspun Declaration ¶ 35. Based on this research, my experience with web design and user experience, and my own experience in viewing webpages on mobile devices, I also know that users—like any individuals presented with content through a visual medium—have complete control with respect to what to view (or ignore) on a webpage and how long to spend on a webpage. And, because they do, Mr. Young's opinion that a website visitor would never see other portions of the webpage, which were indisputably visible on the screen, cannot withstand scrutiny.

5. Moreover, as I explained in my opening testimony responding to Mr. Young's testimony that the Terms of Use hyperlink was not disclosed to Hill because she chose to spend one second on the page view displayed in Young Exhibit N (Greenspun Declaration ¶¶ 27-28), Hill's own choices and actions in interacting with the webpage (*e.g.*, time spent, where to direct her eyes, where not to direct her eyes, what to ignore, etc.) do not (and cannot) bear upon the question of whether the Terms and Conditions (including the Terms of Use link) were disclosed and available to her. To reuse the analogy from my opening testimony, it would be illogical to conclude

---

[1] *See, e.g.*, https://techcrunch.com/2017/05/02/google-will-now-allow-300x250-ads-above-the-fold-onmobile-webpages-says-they-can-be-user-friendly/ (Google revised its advertisement placement policies after research confirmed that advertisements placed "below the fold"—*i.e.*, in a position requiring scrolling by the user—still achieved a 50% viewability rate); https://marketingexperiments.com/conversion-marketing/below-the-fold-boston-globe-test (2012 comparison test analyzed whether viewers were more or less likely to reach the "call to action" button depending on whether the button was above or below text explaining the benefits of subscribing to the Boston Globe newspaper and found no difference, regardless of where the button was placed).

that a particular newspaper article was not disclosed to readers simply because the article was below the fold on the front page and one particular reader made the decision to not unfold the page.

6. Consistent with this, Mr. Young cites (and I am aware of) no study, scientific method, or technical or other evidence supporting his assumption-based opinion that Ms. Hill's eyes looked solely at the address field and the "change" link. *See* Young Declaration ¶ 45. There is, for example, no information available in the technical evidence concerning Ms. Hill's October 2018 visit to LMB.YourVASurvey.info—*e.g.*, the source code for the website or the ActiveProspect and Jornaya video playbacks—that indicates where Ms. Hill actually directed her vision at any point or that otherwise supports Mr. Young's assertion that she only looked at one small spot on a 5-inch screen. The technical evidence confirms, however, and Mr. Young acknowledges, that the Terms of Use link was visible on Ms. Hill's phone when she visited the LMB.YourVASurvey.info website (Young Declaration ¶ 43 & Ex. N), and that the surrounding Terms and Conditions were visible to Ms. Hill for most of her two-minute-plus visit to the website (*id.* ¶ 43 & Exs. K-P). *See* Greenspun Report ¶¶ 33-46; Greenspun Declaration ¶¶ 23-35. Given the technical evidence available, no expert can offer a reliable or credible opinion regarding where Ms. Hill's eyes were focused.

7. In sum, Mr. Young's opinion that "Hill was not offered any reasonable opportunity to see the Terms of Use link and know that she would be bound by the Terms of Use" remains (a) unsupported by any study, scientific method, or technical or other evidence, and (b) belied by Mr. Young's own demonstration that the Terms and Conditions (including the Terms of Use hyperlink) were disclosed to Ms. Hill in close proximity to the "See my results!" call to action button on the LMB.YourVASurvey.info webpage in October 2018 such that she had every opportunity to review them and know that she would be bound by them.

B. **Mr. Young's Standard for "Conspicuousness" Is Not Consistent With Industry Standards.**

8. In his Declaration, Mr. Young opines that the question before him "is not whether the Terms of Use link was on the Webpage or not, but whether it was conspicuous enough for Hill to have been aware of it." Young Declaration ¶ 46. He then concludes that, because "Merriam-Webster defines conspicuous as 'obvious to the eye or mind,'" "[v]isibility of the Terms of Use link was far from obvious to Hill [because] Hill was not offered any reasonable opportunity to see the Terms of Use link and know that she would be bound by the Terms of Use." *Id.*

9. While I do not offer any opinion about whether the Merriam-Webster definition Mr. Young cites is the correct definition of "conspicuousness" for purposes of the issues before the Court, it is my opinion that the LMB.YourVASurvey.info Terms and Conditions more than satisfies that definition and that Mr. Young's contrary conclusion is flawed in several, material respects.

10. First, Mr. Young's opinions concerning the "conspicuousness" of the LMB.YourVASurvey.info Terms and Conditions are unreasonable and inconsistent. Mr. Young opines that the objective standard for measuring "conspicuousness" is whether the information (that is, the words on the webpage) was "obvious to the eye or mind" to "the average site visitor." *Id.* ¶ 45. But, in his first error and inconsistency, Mr. Young concedes that the Terms and Conditions were visible on Ms. Hill's screen, and so were objectively "obvious to the eye." In his second error and inconsistency, he concludes that the Terms and Conditions on the site were not conspicuous based solely on the amount of time Ms. Hill chose to spend on the view of the webpage and where she supposedly would have looked during her time on that page. But, but by Mr. Young's own method, it is improper to measure whether the terms on a website are "conspicuous" based on the particular interactions of a specific user (Ms. Hill) rather than the average site visitor. And, as I explained above, Mr. Young offers no basis to assume that the actions taken by Ms. Hill, or the amount of

time she spent in a particular view on the website, was representative of the "average" visitor (even assuming there was a way to test individuals to determine if there is such an "average" visitor). In this respect, his methodology and conclusion are deeply flawed.

11. Second, Mr. Young offers no basis for his opinion that his supposed "average" visitor would not have seen the website Terms and Conditions, including the Terms of Use hyperlink. Indeed, generally-accepted principles of user interface design require that, whenever possible, webpage designers make new webpages work in the same way that prior, and industry-leading, webpages work. This principle encourages predictable and consistent user experience across the Internet. This is because "humans have a strong memory for where things are visually located on the screen."[2] Web designers "leverage this characteristic by reserving commonly used locations for various graphical elements . . . ."[3] *See* Greenspun Report ¶¶ 47-57.

12. The convention across the Internet, established in the 1990s, is that terms and conditions are accessible at the bottom of a webpage. This is reinforced by the design of market leaders' websites across the Internet, many of which include their terms and conditions at the bottom of the website and often on additional linked pages (including, for example, Amazon, Facebook, Kelley Blue Book, Toyota, Ford, Lexus, and Chrysler).[4]

13. The designers of LMB.YourVASurvey.info and LowerMyBills.com placed the relevant website disclosure language (the section of the page that begins, "By clicking the button above, you express…") near the bottom of the page in close proximity to call to action ("See my results!") button. *See, e.g.*, Young Declaration

---

[2] https://www.interaction-design.org/literature/article/principle-of-consistency-and-standards-inuser-interface-design; *see also* Designing the User Interface, Sixth Edition by Shneiderman, et al. (describing "consistency," including as to website layout, as one of the "Eight Golden Rules of Interface Design").

[3] https://www.interaction-design.org/literature/article/principle-of-consistency-and-standards-inuser-interface-design.

[4] *See* Greenspun Declaration Ex. E.

Ex. N. As Mr. Young acknowledges (*id.* ¶ 44), this is consistent with the placement of terms and conditions on market-leading websites. As the research referenced above confirms, this is precisely because it is where the users would expect to see similar Terms and Conditions consistent with well-established industry norms and standards—norms and standards Mr. Young chooses to ignore in his testimony. *See* Greenspun Report ¶¶ 47-65.

14. In my opinion based upon review of the available research and experience and expertise in website user experience, the Terms and Conditions (including the Terms of Use link) were visible to Ms. Hill and were in precisely the location where a user would expect them to be located.

C. **The LMB.YourVASurvey.Info "Thank You" Page Did Not Employ Video Playback Software in October 2018.**

15. Mr. Young opines that, based on his ***April 2020*** visit to LMB.YourVASurvey.info, the ActiveProspect video playback service is present (today) on both the web form and the separate "Thank You" page and results in two separate video playbacks (one for the web form, and one for the "Thank You" page). Young Declaration ¶ 81. He then concludes that the absence of a second "Thank You" page video showing Ms. Hill's visit to the site in ***October 2018***, is "proof of the lack of the button being clicked" by Ms. Hill. *Id.* However, based on my review of the LMB.YourVASurvey.info website code as it existed in October of 2018 when Ms. Hill visited the website, the ActiveProspect code was not present on the "Thank You" page at that time. As a result, no ActiveProspect video of Ms. Hill's visit to the "Thank You" page would exist and Mr. Young's conclusion that the absence of such a video supports that Ms. Hill did not click the "See my results!" button is factually wrong and contrary to the available technical evidence.

16. Mr. Young also admits that his new opinion on how the ActiveProspect code functions is based on the "assum[ption] that the video would cease once the new page is loaded and [] is visible on the video." *Id.* ¶ 79 (emphasis added). Mr. Young's

assumption, however, is wrong. As I previously testified (Greenspun Declaration ¶¶ 20-22), LMB.YourVASurvey.info is a single-page application **up to, but not including**, the "Thank You" page. When a user clicks the "See my results!" button, the JavaScript accompanying the survey questions terminates, including the ActiveProspect JavaScript running on the webpage. *Id.* The ActiveProspect video would thus terminate prior to loading the "Thank You" page (and the "Thank You" page would not appear in that video).

17. Based on the technical evidence, the absence of a video displaying the "Thank You" page during Ms. Hill's visit in October 2018 (because no video of that page was ever created) has no bearing on whether Ms. Hill clicked the submission button on LMB.YourVASurvey.info and the available technical evidence is that she did.

**D. How the Jornaya Software Functioned on the Affordable-Health-Insurance-Plans.org Website Says Nothing About How the Software Functioned on the LMB.YourVASurvey.info Website in October 2018.**

18. Mr. Young opines that, based on his April 2020 visit to a completely unrelated website (affordable-health-insurance-plans.org), "the Jornaya system collected data for this site visit past the clicking of the 'Submit' button and that click would therefore be visible in the video Jornaya would produce for that LeadID." Young Declaration ¶ 70. From this testimony, Mr. Young appears to suggest (although does not explicitly state) that he believes in October 2018 the LMB.YourVASurvey.info website should have functioned similarly, and that the Jornaya video should have captured Ms. Hill's visit to the "Thank You" page. *See id.*

19. Mr. Young's tour of websites from around the Internet as a way of understanding the Jornaya software and service does not make sense. The behavior of HTML and JavaScript rendered and interpreted by web browsers is deterministic and Mr. Young has been provided with access to the code from 2018 and more recent versions of the website at issue (*e.g.*, via the developer tools in Google Chrome and

other browsers). There is no reason to look at how Jornaya's JavaScript executes on a ***different*** website to explain how Jornaya's JavaScript executed on a particular two-page, multi-part form offered by LMB.YourVASurvey.info.

20. Mr. Young's comparison of the LMB.YourVASurvey.info Jornaya video to the affordable-health-insurance-plans.org video is flawed for the same reasons as is his comparison of the LMB.YourVASurvey.info Jornaya video to the LowerMyBills.com Jornaya video. Greenspun Declaration ¶¶ 19-22. The Jornaya video of Ms. Hill's visit to LowerMyBills.com included the "Thank You" page for that website because LowerMyBills.com is a single-page application ***including*** the "Thank You" page. *Id.* Similarly, the Jornaya video of Mr. Young's visit to affordable-health-insurance-plans.org includes the "Thank You" page for that website because affordable-health-insurance-plans.org is a single-page application ***including*** the "Thank You" page. These both stand in contrast to the LMB.YourVASurvey.info website—which is a single-page application ***excluding*** the "Thank You" page. This means that, on websites structured like LowerMyBills.com and affordable-health-insurance-plans.org, the Jornaya JavaScript continues to run after the visitor clicks the submission button and proceeds to the "Thank You" page (resulting in a video that includes the "Thank You" page). On LMB.YourVASurvey.info, however, the Jornaya JavaScript terminates when the visitor clicks the submission button and before he or she proceeds to the "Thank You" page (resulting in a video that does not include the "Thank You" page).

21. Mr. Young's discussion of how the Jornaya software functioned on the affordable-health-plans.org website has no bearing on how the Jornaya software operated on the different and unrelated LMB.YourVASurvey.info website over 18 months ago. As to the operation of LMB.YourVASurvey.info in 2018, the available technical evidence shows that the code for ActiveProspect to record the "Thank You" page was not embedded on the "Thank You" page and that Ms. Hill, in fact, clicked the "See my results!" button.

8

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 14, 2020.

*Philip Greenspun*

PHILLIP GREENSPUN, Ph.D