**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMANDA HILL, et al., individually and on behalf of all others similarly situated, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>QUICKEN LOANS INC., )<br>)<br>Defendant. ) | Case No. ED CV 19-0163 FMO (SPx)<br><br>**ORDER RE: PENDING MOTIONS** |

Having reviewed and considered the briefing and exhibits filed with respect to defendant Quicken Loans Inc.'s ("defendant" or "Quicken") Motion to Compel Arbitration, (Dkt. 29, "Motion to Compel"), and defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC"), (Dkt. 79, "MTD"), as well as the evidence presented at the multi-day evidentiary hearing, the court concludes as follows.

**BACKGROUND**

Plaintiff Amanda Hill ("plaintiff" or "Hill") filed this putative class action against defendant, alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. (Dkt. 1, Complaint at ¶¶ 43-53). Plaintiff visited YourVASurvey.Info ("YourVASurvey") on October 10, 2018, (see Dkt. 71, Reporter's Transcript of Proceedings ("RT") (Dec. 16, 2019) at 16:11-17:2), seeking to refinance her mortgage.[1]  (RT (Feb. 28, 2020) at 47:1-10).  Plaintiff found

---

[1] Defendant's evidence indicates that plaintiff visited YourVASurvey on October 10, 2018; plaintiff does not recall the exact date she visited the website. (See RT (Feb. 28, 2020) at 53:16-

YourVASurvey after searching the internet for a "specific mortgage company that handled VA loans."[2] (Id. at 47:1-4). She clicked on the website, believing it to be the mortgage company she was looking for, and "began to fill out the form[,]" (id. at 47:5), which asked for information such as plaintiff's name, address, phone number, email address, and the current balance on her mortgage. (Id. at 77:24-81:8).

After filling in some of her information in the YourVASurvey form, plaintiff "started to realize that something wasn't right about [the website]" and when she saw the button at the end of the form that read, "See my results!", it "kind of triggered [her] to know oh, this is not a specific mortgage company." (RT (Feb. 28, 2020) at 47:5-10). According to plaintiff, she did not click the "See my results!" button; rather, she closed the browser. (Id.). Plaintiff explained that she is wary of "spam websites[,]" (see id. at 59:19; 58:3), and that buttons with wording like "See my results!" put her on notice that the website may be a "spam website." (See, e.g., id. at 59:16-21) ("I mean, anything that says to me as a consumer 'see results,' no matter how it's worded, I would not have clicked it, because that triggers to me oh, this is a [s]pam website. Results are several companies now are going to contact you and [s]pam you and everything."). Because plaintiff suspected that YourVASurvey was a "spam website," she entered an email address she uses for websites she suspects of being "spam" websites. (Id. at 80:16-22) ("That's my junk e-mail. If I'm kind of suspecting a site to be [s]pam, I'll use that e-mail."). Additionally, plaintiff claims that if she had entered her phone number on the form, she would not have clicked the "See my results!" button because she would not provide her phone number to a website she suspected of being a "spam" website. (Id. at 58:4-15) ("If I would have put my phone number in, then I would not have – I would

---

54:8). Also, the parties appear to disagree as to whether the website plaintiff visited on October 10, 2018, was YourVASurvey.Info or LMB.YourVASurvey.Info. (See RT (Feb. 28, 2020) at 47:11-50:21). This disagreement does not affect the court's decision, however, because the parties do not indicate how these websites are different nor whether any difference affects the outcome of any issue before the court. (See id. at 43:8-10) ("Q: Okay. And generally, [lmb.yourvasurvey.info] looked similar to the yourvasurvey.info website; is that fair? A: In general, yes.").

[2] The purpose of YourVASurvey is "to communicate to veterans about [refinancing] their mortgage." (Dkt. 71, RT (Dec. 16, 2019) at 10:14-17). Once the veteran provides her information to YourVASurvey, YourVASurvey relays that information to LMB, and LMB matches the veteran to LMB's mortgage clients. (See id. at 10:20-25).

2

have made sure I didn't hit 'submit.' So if I put it in there, I either may have put it in there and then not submitted. I know I didn't submit.").

As plaintiff filled out the form on the YourVASurvey website, she reviewed a series of sequential pages. (See Dkt. 71, RT (Dec. 16, 2019) at 63:18-68:3). On the last page of the survey, plaintiff was presented with the "See my results!" button, with text below it. (See RT (Feb. 28, 2020) at 15:13-21). A blue hyperlink labeled "Terms of Use" was located in paragraph two of the text underneath the "See my results!" button on the final page of the survey. (See Dkt. 71, RT (Dec. 16, 2019) at 67:14-22). If plaintiff had clicked on the hyperlink, she would have been directed to the Lower My Bills ("LMB") website to review those terms.[3] (Id. at 67:23-68:3). Section 2 of LMB's Terms of Use is titled, "Arbitration," and the text of that section is in all capital letters. (Id. at 25:9-14). A consumer who agreed to LMB's Terms of Use would agree "that all claims, disputes, or controversies between [the consumer] and LMB, and its parents, affiliates, subsidiaries or related companies, including but not limited to . . . claims based upon any federal . . . statute [ ] be resolved by final and binding arbitration[.]" (Dkt. 29-5, Declaration of Mitchell Viner in Support of Quicken Loans Inc.'s Motion to Compel Arbitration ("Viner Decl.") at ¶ 24; Dkt. 29-8, Viner Decl., Exh. 3 at 2). According to plaintiff, she did not click on the hyperlink labeled "Terms of Use," nor did she read the arbitration clause. (See Dkt. 39, Declaration of Amanda Hill in Support of Plaintiff's Response in Opposition to Defendant['s] Motion to Compel Arbitration ("Hill Decl.") at ¶ 2; RT (Feb. 28, 2020) at 89:18-90:5).

LMB claims that after plaintiff's visit to the YourVASurvey website – a visit which she claims ended with her closing the browser and defendant claims ended with her clicking the "See my

---

[3] YourVASurvey displayed LMB's Terms of Use on its website because of the "agreement of doing business" between YourVASurvey and LMB. (Dkt. 71, RT (Dec. 16, 2019) at 13:25-14:6). YourVASurvey.Info is a website "powered by LMB[.]" (Dkt. 29-5, Viner Decl. at ¶ 2). Quicken is a client of LMB, meaning LMB refers to defendant consumers seeking to refinance their mortgage. (See Dkt. 71, RT (Dec. 16, 2019) at 9:8-12; Dkt. 29-5, Viner Decl. at ¶ 2 ("Through [websites like LowerMyBills.com and YourVASurvey.Info], LMB offers consumers a free referral service to mortgage loan providers, such as Quicken Loans Inc. [ ] LMB and Quicken Loans are affiliated companies, as Rock Holdings Inc. is the parent company of both.")).

3

results!" button – LMB matched plaintiff with three mortgage clients, including defendant.[4]  (Dkt. 71, RT (Dec. 16, 2019) at 21:17-23).  Subsequently, plaintiff began receiving text messages from LMB as part of its retention campaign, "a campaign that [LMB] run[s] to reengage with consumers that haven't transacted with one of [LMB's] mortgage clients."  (Id. at 22:18-23:14).  These text messages provided a hyperlink, and at least once, plaintiff clicked a link which brought her to LowerMyBills.com ("LowerMyBills").  (Id. at 22:12-23:22).

On November 12, 2018, plaintiff visited LowerMyBills by clicking a link in a text message she received.  (See Dkt. 29-5, Viner Decl. at ¶ 19; Dkt. 71, RT (Dec. 16, 2019) at 22:12-23:22).  According to defendant, because plaintiff had previously provided information to YourVASurvey, most of her personal information was pre-filled by LowerMyBills when she visited the website.  (See Dkt. 29-5, Viner Decl. at ¶ 20).  On LowerMyBills' landing page, there was a button titled "Calculate your free results."  (Dkt. 71, RT (Dec. 16, 2019) at 24:15-17).  Immediately below the "Calculate your free results" button was language stating, "By clicking the button above, you express your understanding, consent electronically, via E-sign to the following[.]"  (Dkt. 71, RT (Dec. 16, 2019) at 24:15-22).  The LMB Lending Terms of Use was one of the items to which a consumer would consent by clicking the "Calculate your free results" button.  (Id. at 24:18-25:8).  These Terms of Use were the same Terms that would have been presented to plaintiff had she clicked the hyperlinked Terms of Use on the YourVASurvey website.  (See id. at 25:5-8).  In other words, she would have been presented with the same arbitration clause quoted above.  (See id.).  Again, plaintiff denies having clicked this button.  (Dkt. 39, Hill Decl. at ¶ 2; RT (Feb. 28, 2020) at 73:18-74:19),

Software embedded in both the YourVASurvey and LowerMyBills websites tracks and records a consumer's activity on each website.  (See Dkt. 71, RT (Dec. 16, 2019) at 28:10-29:9; RT (Feb. 28, 2020) at 13:7-14; 24:21-26:2).  YourVASurvey uses Active Prospect, which "is a third-party vendor that [Suited Connector, the creator of YourVASurvey,] use[s], and [Active

---

[4] According to defendant, plaintiff would not have been matched with mortgage clients had she not clicked the "See My Results!" button.  (See Dkt. 71, RT (Dec. 16, 2019) at 22:4-11).

4

1 Prospect] provide[s] [Suited Connector] with a software called 'Trusted Form,' and in that software,
2 [Suited Connector] ha[s] the ability to when a customer hits [Suited Connector's] site, that begins
3 a recording, and it shows the interaction between a customer and [Suited Connector's] site all the
4 way through until it terminates when they would press the 'see my results' button." (RT (Feb. 28,
5 2020) at 13:7-14). Similarly, LowerMyBills uses Jornaya, which, like Active Prospect, "captur[es]
6 the interactions of the consumer on the web[site – here, LowerMyBills.]" (Dkt. 71, RT (Dec. 16,
7 2019) at 28:17-18).

8 Active Prospect recorded plaintiff's interactions with YourVASurvey, (see RT (Feb. 28,
9 2020) at 14:16-15:1), and Jornaya recorded plaintiff's interactions with LowerMyBills. (See Dkt.
10 71, RT (Dec. 16, 2019) at 33:5-36:4). Both recordings showed plaintiff navigating through the
11 pages of the website and inputting her information. (See RT (Feb. 28, 2020) at 14:16-15:1; Dkt.
12 71, RT (Dec. 16, 2019) at 33:5-36:4). However, neither recording showed plaintiff clicking the
13 "See my results!" or "Calculate your free results" buttons. (See RT (Feb. 28, 2020) at 26:3-27:11).
14 The witness from Suited Connector[5] testified that the video of plaintiff's interactions with the
15 website would not have been recorded and saved if plaintiff had not clicked the "See my results!"
16 button. (Id. at 18:2-5). However, the witness admitted that the video did not show plaintiff clicking
17 the button and that Suited Connector's technology is not perfect at recording whether a consumer
18 actually clicks the "See my results!" button.[6] (Id. at 33:9-11).

19 Each party submitted the declaration of an expert witnesses opining on whether plaintiff
20 clicked "See my results!" on YourVASurvey or "Calculate your free results" on LowerMyBills. (See
21 Dkt. 93, Declaration of Philip Greenspun ("Greenspun"), Ph.D. in Support of Quicken Loans'
22 Motion to Compel Arbitration ("Greenspun Decl."); Dkt. 94, Declaration of Expert Alexander Young
23 ("Young") ("Young Decl.")). Defendant's expert opined that "all of the available technical evidence

---

[5] Suited Connector owns lmb.YourVASurvey.info. (See Dkt. 71, RT (Dec. 16, 2019) at 10:6-10).

[6] Additionally, the witness from LowerMyBills testified that LowerMyBills does not "have any actual evidence that the [Calculate your free results] button was clicked[.]" (Dkt. 71, RT (Dec. 16, 2019) at 55:13-16).

supports only the conclusion that [plaintiff] clicked the 'See my results!' button on the LMB.YourVASurvey.info website during her visit on October 10, 2018;" and that "the 'Terms of Use' hyperlink on the LMB.YourVASurvey.info website was plainly visible to [plaintiff.]" (Dkt. 93, Greenspun Decl. at ¶ 6). By contrast, plaintiff's expert opined that plaintiff "did not click the 'See my Results!' submit button on the Webpage" and that the Terms of Use link "was far from obvious to" plaintiff. (Dkt. 94, Young Decl. at ¶¶ 46 & 85).

After plaintiff visited YourVASurvey and LowerMyBills, "Quicken and other companies began sending SMS text messages to [her] cellular telephone number[,]" allegedly without her consent. (Dkt. 39, Hill Decl. at ¶ 3). According to plaintiff, the text messages from Quicken continued "for over at least the past year, continuing through" at least January 2020. (Dkt. 73, Second Amended Complaint ("SAC") at ¶ 15). Plaintiff alleges that the source of the text messages was 262-93, a "short code," "which is a telephone number leased by Defendant or Defendant's agent(s) or affiliate(s) and is used for operating Defendant's text message marketing program." (Dkt. 73, SAC at ¶¶ 20 & 22). Plaintiff has "on several occasions attempted to put a stop to [the] text messages by responding 'STOP,' to no avail." (Id. at ¶ 16). When she would text "STOP," she would receive a text message from defendant "almost immediately" stating, "You are unsubscribed & will no longer receive messages from us." (Id. at ¶ 27). Nonetheless, plaintiff claims she subsequently received additional text messages from defendant. (See id. at ¶¶ 28 & 29).

## LEGAL STANDARD

I.   MOTION TO COMPEL ARBITRATION.

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, et seq., provides that written arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects "both a liberal federal policy favoring arbitration[] and the fundamental principle that arbitration is a matter of contract[.]" AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339, 131 S.Ct. 1740, 1745 (2011) (citations and internal quotation marks omitted). "The basic role for courts under the FAA is to determine (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement

encompasses the dispute at issue." Kilgore v. KeyBank, Nat'l Ass'n, 718 F.3d 1052, 1058 (9th Cir. 2013) (en banc) (internal quotation marks omitted). "If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000). The FAA "calls on courts to 'rigorously enforce agreements to arbitrate.'" Samson v. NAMA Holdings, LLC, 637 F.3d 915, 923 (9th Cir. 2011) (quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242 (1985)).

"The party seeking to enforce an arbitration agreement bears the burden of showing that the agreement exists and that its terms bind the other party." Gelow v. Cent. Pac. Mortg. Corp., 560 F.Supp.2d 972, 978 (E.D. Cal. 2008); see Sanford v. MemberWorks, Inc., 483 F.3d 956, 963 n. 9 (9th Cir. 2007) ("The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise."). Once the moving party has met this initial burden, "the party resisting arbitration bears the burden of establishing that the arbitration agreement is inapplicable." Wynn Resorts, Ltd. v. Atl.-Pac. Capital, Inc., 497 F.App'x 740, 742 (9th Cir. 2012). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941 (1983) (footnote omitted).

"When evaluating a motion to compel arbitration, courts treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." Totten v. Kellogg Brown & Root, LLC, 152 F.Supp.3d 1243, 1249 (C.D. Cal. 2016) (internal quotation marks omitted); see Geoffroy v. Wash. Mut. Bank, 484 F.Supp.2d 1115, 1119 (S.D. Cal. 2007) ("Courts have employed a summary judgment approach for such hearings [on motions to compel arbitration], ruling as a matter of law where there are no genuine issues of material fact."); Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc., 925 F.2d 1136, 1141 (9th Cir. 1991) ("Only

when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement[, and the court] should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.").

II.  MOTION TO DISMISS.

A motion to dismiss for failure to state a claim should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly (Twombly), 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007); Ashcroft v. Iqbal (Iqbal), 550 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009); Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 550 U.S. at 678, 129 S.Ct. at 1949; Cook, 637 F.3d at 1004; Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 F.3d 806, 812 (9th Cir. 2010). Although the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555, 127 S.Ct. at 1965; Iqbal, 550 U.S. at 678, 129 S.Ct. at 1949; see also Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir. 2004), cert. denied, 544 U.S. 974 (2005) ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (citations and internal quotation marks omitted), "[s]pecific facts are not necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200 (2007) (per curiam) (citations and internal quotation marks omitted); Twombly, 550 U.S. at 555, 127 S.Ct. at 1964.

In considering whether to dismiss a complaint, the court must accept the allegations of the complaint as true, Erickson, 551 U.S. at 93-94, 127 S.Ct. at 2200; Albright v. Oliver, 510 U.S. 266, 267, 114 S.Ct. 807, 810 (1994) (plurality opinion), construe the pleading in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor. Jenkins v. McKeithen, 395 U.S.

8

1 411, 421, 89 S.Ct. 1843, 1849 (1969); Berg v. Popham, 412 F.3d 1122, 1125 (9th Cir. 2005). Dismissal for failure to state a claim can be warranted based on either a lack of a cognizable legal theory or the absence of factual support for a cognizable legal theory. See Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). A complaint may also be dismissed for failure to state a claim if it discloses some fact or complete defense that will necessarily defeat the claim. Franklin v. Murphy, 745 F.2d 1221, 1228-29 (9th Cir. 1984).

## DISCUSSION

I.  MOTION TO COMPEL ARBITRATION.

"A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Knutson v. Sirius XM Radio Inc., 771 F.3d 559, 565 (9th Cir. 2014) (internal quotation marks and alteration omitted). "Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect." Three Valleys Mun. Water Dist., 925 F.2d at 1141 (citations omitted). To determine whether such an agreement exists, "federal courts apply ordinary state-law principles that govern the formation of contracts." Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175 (9th Cir. 2014) (internal quotation marks omitted); see also Wilson v. Huuuge, Inc., 944 F.3d 1212, 1219 (9th Cir. 2019) ("[A]lthough online commerce has presented courts with new challenges, traditional principles of contract still apply. A contract is formed when mutual assent exists, which generally consists of offer and acceptance.") (citations omitted).

Courts may only compel arbitration where there are no genuine disputes of material fact surrounding the arbitration agreement's existence. Hansen v. Rock Holdings, Inc., 434 F.Supp.3d 818, 824 (E.D. Cal. 2020) ("Only when no genuine disputes of material fact surround the arbitration agreement's existence may the court compel arbitration."); Concat LP v. Unilever, PLC, 350 F.Supp.2d 796, 804 (N.D. Cal. 2004). In evaluating such motions, the court draws all inferences in favor of the party opposing arbitration. Totten, 152 F.Supp.3d at 1249. Quicken, "as the party seeking to compel arbitration, must prove the existence of a valid agreement by a preponderance of the evidence." Wilson v. Huuuge, Inc., 944 F.3d 1212, 1219 (9th Cir. 2019).

Here, Quicken's evidence is insufficient to carry its burden of showing, by a preponderance of the evidence, that there was an agreement to arbitrate. See Ashby v. Archstone Prop. Mgmt., Inc., 785 F.3d 1320, 1323 (9th Cir. 2015) (party moving to compel bears burden of showing whether there is an agreement to arbitrate between the parties and whether the agreement covers the dispute); Knutson, 771 F.3d at 565 (applying preponderance of the evidence standard). For example, the court has concerns regarding the sufficiency of defendant's primary evidence in support of their motion to compel, the declaration of Mitchell Viner, the "General Counsel of LMB OpCo, LLC, which is the parent company of LMB Mortgage Services, Inc." (Dkt. 29-5, Viner Decl. at ¶ 1). It is not clear to the court whether Viner, as General Counsel, has any first-hand experience in programming, coding and maintaining software and websites. (See, generally, Viner Decl.). Without such experience, the court is unable to determine whether Viner is competent or qualified to testify as to whether the subject software established that plaintiff clicked the relevant buttons, i.e., whether plaintiff "signed" the contract to arbitrate. In any event, assuming Viner is qualified to testify as to whether plaintiff clicked any of the subject buttons, the testimony appears to be insufficient to establish that plaintiff clicked the subject buttons. (See, generally, Viner Decl.). Viner based his assertion that plaintiff "clicked the button indicating agreement to LMB's Terms of Use and Privacy Policy, as well as providing written consent to be contacted by LMB or a members of its Provider Network[,]" (id. at ¶¶ 17 & 20), on "LMB company records relating to" plaintiff's phone number. (Id. at ¶ 17). Thus, Viner's assertions are only as reliable as LMB's company records. But as noted below, and in light of the questions plaintiff raised at the evidentiary hearing about defendant's evidence, LMB's company records are not sufficient to establish that plaintiff clicked the relevant buttons, thereby agreeing to arbitration.

For example, defendant presented videos from Active Prospect and Jornaya that showed plaintiff's interactions with YourVASurvey and LowerMyBills, respectively. (See Dkt. 71, RT (Dec. 16, 2019) at 28:10-29:9; RT (Feb. 28, 2020) at 13:7-14; 24:21-26:2). Although the videos showed plaintiff navigating through the websites, the videos are not dispositive – or even particularly probative – as to whether plaintiff clicked the buttons because neither video actually showed plaintiff clicking the "See my results!" or "Calculate your free results" buttons. (See RT (Feb. 28,

10

2020) at 26:3-27:11). The witness from Suited Connector testified that the video of plaintiff's interactions with the website would not have been recorded and saved if plaintiff had not clicked the "See my results!" button. (Id. at 18:2-5). However, the witness admitted that the video did not show plaintiff clicking the button and that Suited Connector's technology is not perfect at recording whether a consumer clicks the "See my results!" button. (Id. at 33:9-11). The witness from Suited Connector did not explain why – despite his assertion that Jornaya begins recording consumers' interactions with the website before the consumer clicks "See my results!", (see id. at 25:15-26:2) – the video did not show plaintiff clicking the button, obviously the most important part of the video. (See, generally, id. at 26:3-27:11). Finally, the witness from LowerMyBills testified that LowerMyBills does not "have any actual evidence that the [Calculate your free results] button was clicked[.]" (Dkt. 71, RT (Dec. 16, 2019) at 55:13-16).

Even assuming defendant had put forth sufficient evidence to carry its burden of proof, plaintiff put forth evidence raising a genuine dispute of material fact as to whether the parties entered into an agreement to arbitrate plaintiff's claims. For example, plaintiff submitted a declaration and testified during the evidentiary hearing that she did not click the "See my results!" or "Calculate your free results" buttons on the subject websites.[7] (See RT (Feb. 28, 2020) at 47:19-23 & 73:18-74:19; Dkt. 39, Hill Decl. at ¶ 2 ("I did not input any of my personal contact information, did not click any 'See my results' or 'Click to See Your Free Results' buttons or other buttons on any such website[.]")). Plaintiff testified that she is wary of "spam websites[,]" (see RT (Feb. 28, 2020) at 59:19; 58:3), and that buttons with wording like "See my results!" put her on notice that a website may be a "spam" website. (See, e.g., id. at 59:16-21) ("I mean, anything that says to me as a consumer 'see results,' no matter how it's worded, I would not have clicked it, because that triggers to me oh, this is a Spam website. Results are several companies now are going to contact you and spam you and everything."). Because plaintiff suspected that YourVASurvey was a "spam" website, she entered an email address she uses for websites she

---

[7] The parties also submitted the declarations of dueling expert witnesses, further underscoring the factual dispute. (See Dkt. 93, Greenspun Decl.; Dkt. 94, Young Decl.).

11

suspects of being "spam" websites. (See id. at 80:16-22). Additionally, plaintiff testified that if she had entered her phone number on the form, she would not have clicked the "See my results!" button because she would not have provided her phone number to a website she suspected of being a "spam" website. (See id. at 58:4-15).

Finally, plaintiff's evidence is strengthened – and the sufficiency of defendant's evidence is undermined – by the declarations of three witnesses who, like plaintiff, received text messages from "Quicken and other companies" after visiting LowerMyBills, even though they did not click the submit button. (See Dkt. 40, Declaration of Carrie Tucker [ ] ("Tucker Decl."); Dkt. 41, Declaration of Amber Pickett [ ] ("A. Pickett Decl."); Dkt. 42, Declaration of Brandon Pickett [ ] ("B. Pickett Decl.")). Defendant argues that these declarations are irrelevant to the question of "whether [plaintiff] agreed to LMB Terms of Use – particularly as these individuals voluntarily dismissed their lawsuits against Quicken Loans (Tucker) and LMB (Pickett)." (Dkt. 44, Reply in Support of Quicken Loan[s] Inc.'s Motion to Compel Arbitration ("Reply") at 11 n. 5). But defendant does not explain why the declarations are irrelevant, nor does it explain how the declarants' dismissals of their lawsuits undermines the relevance of their declarations. (See, generally, id.). In any event, the court is persuaded that the subject declarations are relevant as they, coupled with plaintiff's declaration, raise a reasonable inference that anyone could have entered the type of personal information plaintiff entered onto the subject websites, never pressed the submit buttons, and experienced the same result. See, e.g., Hansen, 434 F.Supp.3d at 825-26 & n. 2 (overruling relevance objections to "three sworn declarations from third parties who visited LowerMyBills.com and entered personal information, did not press the submit button, but still received text messages from LMB affiliates, such as Quicken Loans, Inc.").

In short, even assuming Quicken had put forth sufficient evidence to meet its burden of producing sufficient evidence, the court finds that a genuine dispute of material fact exists as to whether plaintiff ever clicked the "See my results!" or "Calculate your free results" buttons, thereby assenting to the Terms of Use on YourVASurvey or LowerMyBills. See Wilson, 944 F.3d at 1219 ("A contract is formed when mutual assent exists, which generally consists of offer and acceptance. . . . In the context of online agreements, the existence of mutual assent turns on

whether the consumer had reasonable notice of the terms of service agreement."). Accordingly, defendant's motion to compel arbitration is denied.

II.     MOTION TO DISMISS.

Defendant contends: (1) that the SAC fails to plead that the court has personal jurisdiction over defendant as to the claims of plaintiff Gayle Hyde; and (2) that plaintiffs' TCPA claim must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).[8] (See Dkt. 79-1, Memorandum of Points and Authorities in Support of Quicken Loans Inc.'s Motion to Dismiss Plaintiffs' Second Amended Complaint ("Memo.") at 1-3). Defendant's argument regarding plaintiff Gayle Hyde is moot in light of the Notice of Settlement dismissing plaintiff Gayle Hyde from this case. (Dkt. 101, Notice of Settlement). Accordingly, the court addresses only defendant's argument about plaintiff's TCPA claim.

To state a TCPA claim, plaintiff must allege facts sufficient to raise a plausible inference that "(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system ['ATDS']; (3) without the recipient's prior express consent." Los Angeles Lakers, Inc. v. Federal Insurance Company, 869 F.3d 795, 804 (9th Cir. 2017). Defendant challenges only the second element, arguing that the allegations in the SAC are insufficient to raise a plausible inference that defendant used an ATDS.[9] (See Dkt. 79-1, Memo. at 13-16). Specifically, defendant contends that plaintiff "offer[s] only bald assertions and a series of legal conclusions to support [her] claim that [defendant] used an ATDS to text [her]." (Id. at 13). Defendant claims that plaintiffs' ATDS allegations "parrot the statutory ATDS definition and general ATDS caselaw on what constitutes an ATDS." (Id.). Defendant's contentions are unpersuasive.

A TCPA plaintiff "need not somehow have inside knowledge of a defendant's operations and equipment; rather, she merely must proffer factual allegations that support a reasonable

---

[8] All future "Rule" references are to the Federal Rules of Civil Procedure.

[9] An ATDS is "equipment which has the capacity – (1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator – and to dial such numbers." Marks v. Crunch San Diego, LLC, 904 F.3d 1041, 1052 (9th Cir. 2018) (footnote omitted)..

13

inference that an ATDS was used." Hale v. Natera, Inc., 2019 WL 4059851, *2 (N.D. Cal. 2019) (internal quotation marks omitted). "Where a TCPA claim is based on the receipt of a text message, courts have found various types of factual allegations suffice to support a reasonable inference the defendant used an ATDS to send it." Id. For example, courts have found claims sufficiently stated where the complaint alleged the text message at issue was "formatted in SMS short code licensed to defendants, scripted in an impersonal matter and sent en masse[,]" Kazemi v. Payless Shoesource, Inc., 2010 WL 963225, *2 (N.D. Cal. 2010); see, e.g., Fishman v. Subway Franchise Advertising Fund Trust, Ltd., 2019 WL 6135030, *8 (C.D. Cal. 2019) (finding ATDS allegations sufficient where plaintiff alleged "that T-Mobile used short message script messaging technology to transmit thousands of unsolicited messages"), and where the recipient was asked to type a one-word response to interact with the text message. See Meyer v. Bebe Stores, Inc., 2015 WL 431148, *4 (N.D. Cal. 2015).

The Ninth Circuit has concluded that ATDS allegations were sufficient where the plaintiff alleged that:

> (1) Adir sent [the plaintiff] an identical text message on four separate occasions; (2) every time [the plaintiff] received this text message, he sent a text message back to Adir saying 'Stop,' and after sending that message, he 'almost immediately' received another text message from Adir stating that he would no longer receive text messages from Adir; (3) notwithstanding Adir's representation that [the plaintiff] would not receive further text messages, [the plaintiff] continued to receive the same text message on at least three additional occasions; (4) both categories of text messages – the initial texts and the removal confirmation texts – were generically formatted and appeared to be scripted; (5) although the initial texts included a reference number, none of the texts referenced plaintiff directly; and (6) the texts came from an SMS shortcode, which are typically associated with automated services.

Flores v. Adir, International, LLC, 685 F.Appx. 533, 533 (9th Cir. 2017).

Here, plaintiff's SAC includes several of the indicia of an ATDS. Specifically, plaintiff alleges that Quicken sent her a series of text messages with generic language such as, "Quicken Loans: Time's running out on our Biggest Deal of the Year! Lock your rate now[,]" followed by a link, followed by "Reply HELP for help, STOP to end text." (Dkt. 73, SAC at ¶ 23). These text messages came from short code 262-93. (Id. at ¶¶ 20 & 22). Plaintiff replied to defendant's texts with STOP, but the text messages kept coming. (See id. at ¶¶ 16 & 24-26 & 30). After plaintiff replied to the text messages with "Stop," she "almost immediately" received a generic reply such as, "QLTextAlerts: You are unsubscribed & will no longer receive messages from us. Reply HELP for help. Msg&Data Rates May Apply. 1-800-863-4332[.]" (Id. at ¶ 27). Based on these allegations, it is reasonable to infer that defendant sent plaintiff the text messages at issue using an ATDS. Therefore, the court concludes that the SAC's ATDS allegations pass Rule 12(b)(6) muster.

## **CONCLUSION**

Based on the foregoing, IT IS ORDERED THAT:

1. Defendant's Motion to Compel Arbitration **(Document No. 29)** is **denied**.
2. Defendant's MTD **(Document No. 79)** is **denied**.

Dated this 5th day of August, 2020.

/s/
Fernando M. Olguin
United States District Judge